**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ISAAC ASHKENAZIE, <br><br> Plaintiff, <br><br> v. <br><br> TRANS UNION, LLC, *et al.*, <br><br> Defendants. | Civil Action No. 20-11924 (MAS) (LHG) <br><br> **MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on Defendant Synchrony Bank's ("Synchrony") Motion to Enforce a settlement agreement (the "Motion") against Plaintiff Isaac Ashkenazie ("Ashkenazie"). (ECF No. 33.) Ashkenazie opposed (ECF No. 36), and Synchrony replied (ECF No. 37). The Court has carefully considered the parties' submissions and decides the motion without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants Synchrony's Motion.

**I.    BACKGROUND**

This case is about a common question of contract law: did the parties have a contract? Here, the contract is a purported settlement agreement between Ashkenazie and Synchrony to settle Ashkenazie's Fair Credit Reporting Act ("FCRA") claim against Synchrony. Ashkenazie says the parties never settled; Synchrony says they did. In support of their positions, the parties have submitted dueling declarations from each party's attorney, Ari Marcus ("Marcus") for Ashkenazie and Paul Gibson ("Gibson") for Synchrony. (Marcus Decl., ECF No. 36-2; Gibson Decl., ECF No.

33-2.)[1] Perhaps unsurprisingly then, the facts of this case rest on the he said, he said battle of the declarants. In any event, the facts below are presented in the light most favorable to the non-moving party, Ashkenazie.

A.  **The Parties' Settlement Discussions**

Ashkenazie sued Synchrony and three credit-reporting agencies, Trans Union, LLC ("Trans Union"), Equifax Information Services, LLC ("Equifax"), and Experian Information Solutions, Inc. ("Experian") (collectively, the "Credit Reporting Defendants"). (*See generally* Compl., ECF No. 1.) According to Ashkenazie, Synchrony and the Credit Reporting Defendants violated the FCRA when they failed to clear a fraudulent $20,000 credit charge on Ashkenazie's credit report, thereby harming Ashkenazie's credit score. (Marcus Decl. ¶ 4.)

Through counsel, Ashkenazie and Synchrony began settlement discussions on January 7, 2021. (Marcus Decl. ¶ 6; Gibson Decl. ¶ 5.) During a phone call that day, Marcus questioned Gibson about whether Synchrony had verified the $20,000 charge on Ashkenazie's credit account as accurate. (Marcus Decl. ¶ 6.) He asked Gibson this because, before this phone call, counsel for the Credit Reporting Defendants had informed him that Synchrony was still verifying the charge as accurate. (*Id.*) Marcus avers that Gibson told him that the charge was fraudulent. (*Id.*) Gibson disputes this fact, declaring that he told Marcus that Ashkenazie's account was "probably fraudulent." (Def.'s Reply Br. 2; Gibson Decl. ¶ 14 ("I did not state with absolute certainty that the account was fraudulent.").) Marcus further avers that during this phone call, Gibson stated that Synchrony denied that it was still verifying the charge as accurate to the Credit Reporting Defendants. (Marcus Decl. ¶ 6.) Gibson does not appear to dispute this fact.

---

[1] Ashkenazie also submitted a declaration. (Ashkenazie Decl., ECF No. 36-1.)

Also while on the phone, Marcus offered to settle his client's claim in exchange for $25,000, debt forgiveness, and removal of the fraudulent charge from Ashkenazie's credit report (also known as tradeline deletion). (Gibson Decl. ¶ 6.) Gibson relayed that offer to Synchrony, which then authorized a counteroffer of $15,000, debt forgiveness, and tradeline deletion. (Gibson Decl. ¶ 7.) Gibson sent an e-mail message to Marcus reflecting that counteroffer. (Gibson Decl. ¶ 7; Def.'s Mot. Ex. A, ECF No. 33-3.) About an hour later, Marcus responded with a counteroffer of his own: "FRE 408: If you can get me five figures with a 2 in front, I can wrap this up. I would assume that Synchrony removed the tradeline and cleared the debt by now, and if not, they better do it ASAP whether we settle or not." (Gibson Decl. ¶ 8; Def.'s Mot. Ex. A.) About an hour-and-a-half later, Gibson replied to Marcus: "I got you your five figures and your 2. <u>We are settled at $20,000</u>. I'll draft a settlement agreement and try to get that to you tomorrow." (Gibson Decl. ¶ 9; Def.'s Mot. Ex. A; *see also* Marcus Decl. ¶ 10 ("[W]e then ultimately negotiated an agreement to settle with the Synchrony Defendants for $20,000 . . . .").) According to Marcus, throughout the day, other than the settlement price, debt forgiveness, and tradeline deletion, "[n]o other terms were discussed." (Marcus Decl. ¶ 10.)

### B. The Initial Pretrial Conference

The next day, the Honorable Lois Goodman, U.S.M.J., held the initial pretrial conference for this matter, which included Marcus, Gibson, and counsel for the Credit Reporting Defendants. (Marcus Decl. ¶ 11; Gibson Decl. ¶ 10.) Marcus advised the Court that the parties had settled. (Gibson Decl. ¶ 10.) Marcus asserts that counsel for the Credit Reporting Defendants advised the Court that Synchrony continued to report Ashkenazie's $20,000 credit charge as accurate. (Marcus Decl. ¶ 12.) In response, Marcus told the Court that Synchrony admitted that the charge on Ashkenazie's account was fraudulent. (Marcus Decl. ¶ 12; Gibson Decl. ¶ 11.) Then, according to Marcus, "Gibson quickly jumped on the call and stated that Synchrony does not admit that the

3

account was fraudulent." (Marcus Decl. ¶ 13; *see also* Gibson Decl. ¶ 11 ("I clarified that Synchrony does not admit any wrongdoing . . . .").) Marcus avers that Gibson's statement was "the exact opposite of what Synchrony had represented on our prior call." (Marcus Decl. ¶ 13.)

  C. **The Post-Pretrial Conference Settlement Discussions**

Following the pretrial conference, Marcus e-mailed Gibson on January 11, noting that Gibson's statements at the conference rendered Gibson's earlier assertions on the phone call false. (Pl.'s Opp'n Br. Ex. C, ECF No. 36-5; Gibson Decl. ¶ 12.) Thus for Marcus, it was "clear that a settlement/meeting of the minds has not been met." (Pl.'s Opp'n Br. Ex. C.) The next day, Gibson replied to Marcus:

> I do not believe that I made any false representation to you or to the Court. One attorney saying to another that an account is probably fraudulent is different from admitting this as a fact in front of a judge. As for the reporting, my client says they are currently reporting it as disputed. I don't know what Trans Union's [sic] counsel told you but saying an account is in dispute is not the same as saying the reporting is accurate.

(Pl.'s Opp'n Br. Ex. B, ECF No. 36-4; Marcus Decl. ¶ 15.) The communications appear to cease there. (Gibson Decl. ¶ 17 ("After Mr. Marcus attempted to withdraw from the settlement on January 11, 2021, I made numerous attempts to reach Mr. Marcus by phone and email to attempt to get the settlement back on track. I could not connect with Mr. Marcus by phone and my calls were not returned. My emails to Mr. Marcus were not returned.").)

  D. **The Instant Motion**

Following the breakdown in communication, Synchrony filed the instant Motion, arguing that the parties reached an enforceable settlement agreement on January 7, 2021. (*See* Def.'s Moving Br., ECF No. 33-1.) Ashkenazie opposed, countering that no meeting of the minds existed due to Synchrony's alleged misrepresentations. (*See* Pl.'s Opp'n Br., ECF No. 36.) During the pendency of this Motion, Ashkenazie also settled with each of the Credit Reporting Defendants.

4

(*See* Notice of Settlement with Equifax, ECF No. 31; Notice of Settlement with TransUnion, ECF No. 35; Notice of Settlement with Experian, ECF No. 38.)

## II. <u>LEGAL STANDARD</u>

"The stakes in summary enforcement of a settlement agreement and summary judgment on the merits of a claim are roughly the same—both deprive a party of his right to be heard in the litigation." *Tiernan v. Devoe*, 923 F.2d 1024, 1031 (3d Cir. 1991). Courts, therefore, treat a motion to enforce a settlement under the same standard as a motion for summary judgment, *id.* at 1032, and grant the motion when the moving party demonstrates that there is no genuine dispute of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

A settlement agreement between parties in a lawsuit is a contract and, therefore, governed by state contract law. *Jacob's Limousine Transp., Inc. v. City of Newark*, 688 F. App'x 150, 151 (3d Cir. 2017); *Excelsior Ins. v. Pennsbury Pain Ctr.*, 975 F. Supp. 342, 348-49 (D.N.J. 1996). "A contract arises from offer and acceptance" and "must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.' Thus, if parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992) (second quoting *Borough of W. Caldwell v. Borough of Caldwell*, 138 A.2d 402, 410 (N.J. 1958)).

Despite these requirements, a settlement agreement does not need to contain every possible term to be enforceable. *Bistricer v. Bistricer*, 555 A.2d 45, 47 (N.J. Super. Ct. Ch. Div. 1987). Rather, "[s]o long as the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound." *Id.* (citation omitted). "[A]s long as those essential terms are agreed to, 'the settlement will be enforced notwithstanding the fact . . . [the] writing does not materialize because a party later reneges.'" *McDonnell v. Engine Distribs.*, No. 03-1999, 2007 WL

2814628, at *3 (D.N.J. Sept. 24, 2007) (quoting *Lahue v. Pio Costa*, 623 A.2d 775, 788 (N.J. Super. Ct. App. Div. 1993)). This is true "even [if the parties] contemplate the later execution of a formal document to memorialize their undertaking." *United States v. Lightman*, 988 F. Supp. 448, 459 (D.N.J. 1997).

Finally, in New Jersey, there is a strong public policy in favor of settlements. *Nolan ex rel. Nolan v. Lee Ho*, 577 A.2d 143, 146 (N.J. 1990). Courts, therefore, will "strain to give effect to the terms of a settlement whenever possible." *Dep't of Pub. Advocate, Div. of Rate Counsel v. N.J. Bd. of Pub. Utils.*, 503 A.2d 331, 333 (N.J. Super. Ct. App. Div. 1985); *see also Borough of Haledon v. Borough of N. Haledon*, 817 A.2d 965, 975 (N.J. Super. Ct. App. Div. 2003). Despite this strong policy favoring settlements, a court will not enforce a settlement agreement "where there appears to have been an absence of mutuality of accord between the parties or their attorneys in some substantial particulars, or the stipulated agreement is incomplete in some of its material and essential terms." *Bistricer*, 555 A.2d at 47 (citation omitted).

### III.   DISCUSSION

The Court treats Synchrony's Motion like a summary judgment motion; Synchrony must provide sufficient evidence to persuade the Court that an enforceable settlement agreement existed between it and Ashkenazie. The Court finds that Synchrony has met its burden.

#### A.   The Parties Agreed to Settle.

A settlement is like any other contract. Thus, where "parties agree on essential terms and manifest an intention to be bound by those terms, they have created an enforceable contract." *Weichert Co. Realtors*, 608 A.2d at 284. The parties dispute the essential terms in the alleged settlement agreement. New Jersey courts look to the "context and the parties' view of what is important in determining the materiality of any disputed terms." *JM Agency, Inc. v. NAS Fin.*

*Servs., Inc.*, No. A-5898-05T5, 2007 WL 2215393, at *4 (N.J. Super. Ct. App. Div. Aug. 3, 2007) (per curiam) (citations omitted).

Here, the negotiations tell the story of what the parties found important: the settlement price, debt forgiveness, and tradeline deletion. In virtually every settlement communication, the parties raised these three terms. (*E.g.*, Def.'s Mot. Ex. A ("I hereby offer the full extent of my settlement authority, which is **$15,000**. In addition, Synchrony will, if not already done, clear the debt and delete the tradeline.").) The record reflects several ping-ponging communications about the settlement price, first at $15,000, then at $25,000, then settled at $20,000. (Gibson Decl. ¶¶ 6-8; Def.'s Mot. Ex. A.) The record also reflects the significance of the debt forgiveness and tradeline deletion terms, particularly for Ashkenazie. (*See* Def.'s Mot. Ex. A ("If you can get me five figures with a 2 in front, I can wrap this up. I would assume that Synchrony removed the tradeline and cleared the debt by now, and if not, they better do it ASAP whether we settle or not.").)

Could other essential terms have snuck into the contract? Ashkenazie argues that at least one did—Synchrony's admission that the $20,000 charge was fraudulent. (*See* Pl.'s Opp'n Br. 8 ("Here, the parties agreed to a settlement on a Thursday, predicated on Synchrony's admission that it knew the account was fraudulent and its statement that it would not have verified such an account.").) The Court, however, finds that Ashkenazie has failed to raise a genuine dispute that that term was material. The parties never spent any time, either through e-mail message or by phone, negotiating a Synchrony admission that the $20,000 charge was fraudulent. *But see JM Agency, Inc.*, 2007 WL 2215393, at *4 ("In light of the considerable time and effort spent over the question, it is plain to see that the parties viewed this term as something essential or material to their undertaking."). And as Marcus admits, "[n]o other terms were discussed" other than the settlement price, debt forgiveness, and tradeline deletion. (Marcus Decl. ¶ 10.) Had the term been

7

essential to the overall settlement, the record ought to contain references to the parties' negotiating over Synchrony's factual admission. It does not. *But see JM Agency, Inc.*, 2007 WL 2215393, at *4 ("The parties' actions during and subsequent to the settlement negotiations demonstrate their shared belief that whether defendants would admit liability was a material aspect of their nascent settlement agreement.").

To be sure, Ashkenazie points the Court to no evidence that he thought Synchrony's admission to be significant during the negotiations. Ashkenazie posits that the Synchrony admission must have been material because the admission could improve his litigation posture against the Credit Reporting Defendants. (*See* Marcus Decl. ¶ 8 ("[I]f the three credit reporting agencies were continuing to report this inaccurate information after Synchrony had declined to verify this information, then Plaintiff would have very viable claims against those three Defendants, from whom a greater recovery could be sought.").) If that were so, Marcus would have insisted on including that admission in the settlement agreement during negotiations. Indeed, Marcus had reason to doubt Gibson's proffered explanation—having already heard from counsel for the Credit Reporting Defendants that Synchrony was still verifying the $20,000 charge as accurate. (Marcus Decl. ¶ 6.) But instead, the record reflects that Marcus never insisted on a formal admission from Synchrony. Simply put, if Marcus thought Synchrony's admission was important to the settlement, he would have demanded its inclusion.

Nor is the record clear as to the force of Ashkenazie's position that the admission would have improved his litigation position with the Credit Reporting Defendants. For one, without the benefit of the admission, Ashkenazie still settled with *all three* Credit Reporting Defendants after the breakdown in settlement talks with Synchrony. (*See* Notice of Settlement with Equifax, ECF No. 31; Notice of Settlement with TransUnion, ECF No. 35; Notice of Settlement with Experian,

ECF No. 38.) Further, even if the parties had included the admission in their settlement agreement, how Ashkenazie would have armed that admission against the Credit Reporting Defendants in litigation is murky. As Synchrony points out, settlement agreements are often confidential and inadmissible under Federal Rule of Evidence 408. (Def.'s Reply Br. 7; *accord Pfizer v. Mylan*, No. 10-3246, 2012 WL 13034382, at *2 (D.N.J. Jan. 4, 2012) ("[S]ettlement is usually the product of confidential negotiations and Federal Rule of Evidence 408, which generally precludes the admissibility of such documents.").) Indeed, Ashkenazie recognized the import of Rule 408 by preceding his settlement e-mail messages with "FRE 408." (Gibson Decl. ¶ 8; Def.'s Mot. Ex. A.) The inference from Ashkenazie's post-negotiation conduct is that Synchrony's admission was insignificant for his litigating position against the Credit Reporting Defendants.

But there's even more evidence on the record evincing that the parties settled. Through counsel, Ashkenazie admitted in open court that the parties had settled. (Gibson Decl. ¶ 10.) That alone shows that the parties intended to be bound by their agreed-upon settlement, which included the essential terms of price, debt forgiveness, and trade deletion. *See Bistricer*, 555 A.2d at 47 ("So long as the basic essentials are sufficiently definite, any gaps left by the parties should not frustrate their intention to be bound." (citation omitted)). True, post-conference, Ashkenazie attempted to revoke the settlement by arguing that no meeting of the minds had occurred. (Pl.'s Opp'n Br. Ex. C, ECF No. 36-5; Gibson Decl. ¶ 12.) But without the benefit of any evidence showing that the Synchrony admission was significant to the parties during the settlement negotiations, Ashkenazie's January 11 e-mail message is no more than reneging on an agreed-upon contract. *See McDonnell*, 2007 WL 2814628, at *3 ("[A]s long as those essential terms are agreed to, 'the settlement will be enforced notwithstanding the fact that a writing does not materialize because a party later reneges.'" (citation omitted)).

9

Reinforcing the Court's holding that a settlement existed between the parties is New Jersey's strong public policy in favor of settlements. *See Dep't of Pub. Advocate*, 503 A.2d at 333 (citing *Pascarella v. Bruck*, 462 A.2d 186, 190 (N.J. Super. Ct. App. Div. 1983)). At the heart of that policy is "the notion that the parties to a dispute are in the best position to determine how to resolve a contested matter in a way which is least disadvantageous to everyone." *Id.* To that end, "courts will strain to give effect to the terms of a settlement" and will eschew "any action which would have the effect of vitiating the provisions of a particular settlement agreement" or the "effect of undermining public confidence in the settlement process." *Id.* at 333-34. That is precisely what is happening here. Ashkenazie and Synchrony determined the most significant terms to them—which did not include factual admissions of any sort from Synchrony—and reduced those terms down to a preliminary settlement. After the fact, Ashkenazie complained that the admission was not included in the settlement. In response to that challenge, the Court strains to give effect to the settlement by carefully reviewing the parties' negotiating history to determine that Ashkenazie has not shown the factual admission to be material. Further, adopting Ashkenazie's position violates New Jersey public policy not only by vitiating the agreed-upon provisions in the parties' settlement but also by undermining public confidence in allowing parties to craft post hoc reasons to abandon agreed-upon settlements. The Court doubts New Jersey policy countenances such an outcome.

### B. Material Misstatements Did Not Vacate the Settlement.

Ashkenazie also argues that "Synchrony's material misrepresentations makes [sic] the agreement void and unenforceable." (Pl.'s Opp'n Br. 8 (citing *Mellon Bank Corp. v. First Union Real Est. Equity & Mortg. Invs.*, 951 F.2d 1399, 1410 (3d Cir. 1991)). Although unclear as to what those misstatements are, Ashkenazie appears to assert that Gibson's statement that Synchrony did not verify the accuracy of Ashkenazie's credit account was inaccurate. (*See id.* at 7.) Thus for

10

Ashkenazie, Gibson induced him into settlement because "Synchrony was not the one responsible for keeping the [$20,000 charge] on his credit report." (*Id.*)

The Court disagrees. As a threshold matter, New Jersey courts require "'clear and convincing proof' that the agreement should be vacated." *Nolan*, 577 A.2d at 146 (quoting *De Caro v. De Caro*, 97 A.2d 658, 661 (1953)); *see also Jennings v. Reed*, 885 A.2d 482, 488 (N.J. Super. Ct. App. Div. 2005) ("[T]he party seeking to set aside the settlement agreement has the burden of proving . . . extraordinary circumstances sufficient to vitiate the agreement."). To that end, Ashkenazie must show "a material misrepresentation made with intent that it be relied on, coupled with actual or detrimental reliance." *Nolan*, 577 A.2d at 146. Broken down, three requirements emerge: (1) a material misrepresentation made by Synchrony, (2) intent to induce Ashkenazie by Synchrony, and (3) detrimental reliance for Ashkenazie.

The Court finds that Ashkenazie has not proven any of the three requirements by clear and convincing evidence. *First*, for the same reasons as above, Ashkenazie has not shown that statements concerning Synchrony's admissions about account verification were material. *Second*, Ashkenazie points to zero evidence that Synchrony intended to induce him to settle—unsurprising considering that the parties never discussed including factual admissions in the settlement. *Finally*, the record does not show clear and convincing evidence that Ashkenazie would suffer detrimental reliance by the enforcement of this settlement. Although Ashkenazie complains that this settlement makes his litigation position against the Credit Reporting Defendants weaker (*see* Marcus Decl. ¶ 8), Ashkenazie's settlements with those Defendants belie that alleged harm (*see* ECF Nos. 31, 35, 38).

IV.   **CONCLUSION**

Synchrony has met its burden to show that the settlement agreement should be enforced. The Court, therefore, grants Synchrony's Motion. An appropriate order will follow.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE